**United States District Court**
**District of Massachusetts**

———————————————————————
                                    )
Jeannie T. Lee,                     )
                                    )
        Plaintiff,                  )
                                    )
            v.                      )    **Civil Action No.**
                                    )    **19-12289-NMG**
Howard Hughes Medical Institute,    )
                                    )
        Defendant.                  )
———————————————————————)

**MEMORANDUM & ORDER**

**GORTON, J.**

This action arises from the decision of defendant Howard Hughes Medical Institute ("the Institute" or "defendant") not to renew plaintiff Dr. Jeannie Lee ("Dr. Lee" or "plaintiff") for a fourth five-year term of employment as a research scientist. Dr. Lee alleges that the decision was discriminatory and asserts several claims against the Institute with respect to her non-renewal and her salary.

Pending before the Court is the Institute's motion for summary judgment (Docket No. 71) which, for the reasons that follow, will be allowed.

-1-

I.  **Background**

   A. **Dr. Lee's Appointment**

   In 2000, the Institute, a not-for-profit biomedical research organization headquartered in Chevy Chase, Maryland, appointed Dr. Lee to become a research scientist, referred to by the parties as "an Investigator".  Dr. Lee is an Asian-American molecular geneticist who holds M.D. and Ph.D. degrees from the University of Pennsylvania.  At the time of her appointment, she worked at Massachusetts General Hospital ("MGH") as a researcher in its Department of Molecular Biology.  Dr. Lee's research has focused on X-chromosome inactivation and the role of non-coding RNA in that process, as well as basic biological mechanisms and their translation to treat sex-linked disorders such as Rett Syndrome, a rare genetic mutation affecting brain development.

   Once appointed, an Investigator becomes an Institute employee but continues to do research at his or her home institution, albeit with the support of substantial funding from the Institute.  Dr. Lee, accordingly, continued her work at MGH while on the payroll of the Institute and with the benefit of Institute funds.  That mutually beneficial relationship continued for 15 years and through two reappointments in 2006 and 2011 as an Institute Investigator.  In 2016, however, Dr. Lee was not renewed for a fourth term.

### B. The Institute's Investigator Renewal Process

The Institute's review and reappointment process is managed by its Senior Scientific Officers, who, in 2016, were Dr. Barbara Graves ("Dr. Graves"), Dr. Philip Perlman ("Dr. Perlman"), Dr. Judith Glaven ("Dr. Glaven") and Dr. Janet Shaw ("Dr. Shaw" and, together with Drs. Graves, Perlman and Glaven, "the Senior Scientific Officers"), in conjunction with its Vice President and Chief Scientific Officer who, in 2016, was Dr. David Clapham ("Dr. Clapham" or "the Vice President"). Those officers are assisted by an advisory panel of many scientists who are not Institute employees ("the advisory panelists").

The Institute holds Investigator review meetings several times each year at its headquarters. Prior to each meeting, it assigns four advisory panelists to read and consider all the written material submitted by an Investigator in support of his or her renewal application. That material may include a curriculum vitae, significant publications, descriptions of research accomplishments and highlights of the Investigator's important activities.

At the review meeting, each Investigator is allotted 35 minutes to present his or her research program orally to the whole advisory panel, after which a brief question-and-answer session is held. The Investigator is excused and the four assigned reviewers comment upon the Investigator's progress,

-3-

strengths and weaknesses of his or her research and prospects for future contributions.  Thereafter, other members of the advisory panel may share their opinions.  Members of Institute leadership will sometimes attend the presentation, question-and-answer session and subsequent discussion as well.

Prior to the conclusion of the meeting, each advisory panelist confidentially submits a score, in the form of a letter grade, for the Investigator under review.  (The advisory panelists may also provide written comments if they so choose.) The scores, which are "A", "B" or "C", evaluate an Investigator as to whether:

i.    they identify and pursue significant biological questions in a rigorous and deep manner;

ii.   they push their chosen research field into new areas of inquiry, being consistently at its forefront;

iii.  they develop new tools and methods that enable creative experimental approaches to biological questions, bringing to bear, when necessary, concepts or techniques from other disciplines;

iv.   they forge links between biology and medicine;

v.    they demonstrate great promise of future original and innovative contributions; and

vi.   they are active in service and training in their host institutions, and in the greater scientific community.

An "A" score reflects clear fulfilment of most of the review criteria.  A "B" score reflects a significant record of accomplishment and productivity accompanied by some concerns about the extent of the subject Investigator's leadership in the

field, focus or depth of his or her research or prospects for future contributions.  A "C" score reflects a failure to meet the review criteria.

After all the Investigators in the review cohort have been evaluated by the advisory panel, the Vice President and the Senior Scientific Officers convene and consider the panelists' comments and scores.  They then meet with the President of the Institute, who at the time of the plaintiff's relevant evaluation was Dr. Erin O'Shea ("Dr. O'Shea" or "the President"), to whom they present a recommendation with respect to the renewal of each Investigator.  The ultimate renewal determination is made by the President, who has access to the material relied upon by the advisory panel and the other Institute executives.

Each Investigator is notified of his or her renewal or non-renewal within two days of the President's decision.  Within several weeks of the decision, the Investigator is also provided with written critiques from his or her four assigned reviewers addressing, inter alia, achievements, strengths and weaknesses, as well as a review report from the Institute.

### C. Dr. Lee's Non-Renewal

Prior to her 2016 non-renewal, Dr. Lee had been twice renewed as an Institute Investigator.  In 2006, she received 21 "A" scores and no "B" or "C" scores.  Her assigned reviewers

described her work in mostly favorable terms, albeit with a few negative comments, and she was awarded an aggregate "A" score and renewed for a second term.  In 2011, Dr. Lee received 13 "A" scores, one "B" score and no "C" scores.  Again, Dr. Lee received mostly favorable comments, and again, she was awarded an aggregate "A" score and renewed for a third term.

In June, 2016, Dr. Lee submitted her review materials to the Institute in support of her application for renewal for a fourth term as an Institute Investigator.  Dr. Lee's materials included, inter alia, a list of five publications from her current term that she identified as her most important, a curriculum vitae and a research summary.  Dr. Lee was one of a cohort of twelve Investigators up for review in September, 2016.

In September, 2016, Dr. Lee presented her work to the advisory panel and answered questions from its 18 members, including her four assigned reviewers.  Dr. Lee then left the meeting.  Several advisory panelists expressed concern about Dr. Lee's research, including the rigor and testing of her scientific models.  At the conclusion of the meeting, Dr. Lee received no "A" scores, 11 "B" scores and 7 "C" scores.  Eight panelists submitted comments, most of which reflected concern about Dr. Lee's models and approach to research.

The scores and comments of the advisory panel were relayed to the Institute's leadership, most of which had attended Dr.

-6-

Lee's presentation to the advisory panel.  The leadership, i.e. the Senior Scientific Officers and the Vice President, Dr. Clapham, recommended that the President, Dr. O'Shea, not renew Dr. Lee as an Investigator.  Dr. O'Shea ultimately decided not to renew Dr. Lee for a fourth term as an Investigator.

On September 16, 2016, Dr. Lee was informed by email of the non-renewal decision.  Dr. Lee later received written critiques from her four assigned reviewers and a copy of her review report.  She was one of four Investigators in her 12-person cohort whose appointment was not renewed.  In accordance with Institute policies, Dr. Lee entered a two-year phase-out period that concluded in September, 2018, after which she reverted to her prior status as an MGH employee.

### D. Dr. Lee's Salary

Since the early 2000s, Dr. Lee claims she was underpaid relative to other Investigators based at MGH.  She expressed that concern to her department chairs at the hospital on numerous occasions between 2005 and 2016.  In or about 2012, for reasons not apparent from the record, MGH began to pay Dr. Lee bonuses to compensate for the alleged disparity.[1]

---

[1] Prior to September, 2018, Investigator salaries and raises were set by the Institute in consultation with host institutions, e.g. MGH.  Since then, the Institute has set salaries by reference to a scale which accounts for seniority, geography and various merit-based considerations.

In 2016, Dr. Lee's salary from the Institute was $250,000. In May, 2016, Dr. O'Shea sent an email to the Vice President of Research at MGH, Dr. Harry Orf ("Dr. Orf"), stating that there would be a proposed Investigator salary increase of 2% for the following fiscal year and requesting MGH's recommendation for the distribution of that increase among the Investigators at MGH.  Dr. Orf recommended that the Institute increase Dr. Lee's salary by 2% (i.e. to $255,000) which the Institute approved.

In August, 2016, Dr. Orf requested that the Institute increase Dr. Lee's salary by an additional $25,950.  The request arose from a salary and equity review that MGH had conducted that focused on gender and seniority within its Department of Molecular Biology ("the Department").  That review indicated that Dr. Lee was underpaid relative to others in the Department. (The Department consisted almost entirely of MGH, rather than Institute, employees.)  Dr. O'Shea agreed to raise Dr. Lee's salary by an additional $10,000 for the following fiscal year.

On August 26, 2016, MGH informed Dr. Lee of the additional increase and shortly thereafter the Institute confirmed the increase by email.  The subject line of that email was "Revised Compensation Statement".  The sender, Steven Barbour, the Science Operations Manager for the Institute, informed Dr. Lee that

Molecular Biology and Dr. Orf's office made an equity request on your behalf.  This statement reflects the approved increase.

## II.  Procedural History

In July, 2017, Dr. Lee filed a charge of discrimination with the Massachusetts Commission Against Discrimination ("the MCAD"), alleging that the Institute had discriminated against her on the basis of age, race, sex and national origin when it declined to renew her service as an Investigator.  She also claimed that, during her service as an Investigator, the Institute had discriminatorily paid her a substandard salary.

A little over two years later, Dr. Lee commenced the present action in Massachusetts Superior Court for Suffolk County, alleging discriminatory nonrenewal, in violation of M.G.L. c. 151B ("Count I"), salary discrimination, in violation of M.G.L. c. 151B ("Count II"), salary discrimination, in violation of M.G.L. c. 149, § 105A ("Count III"), breach of contract arising out of her nonrenewal ("Count IV") and breach of contract arising out of her insufficient salary ("Count V"). The Institute timely removed the action to this court and denied all substantive allegations.

In May, 2020, the Court allowed defendant's motion to dismiss the two breach of contract claims. The Institute now

moves for summary judgment on Dr. Lee's three remaining claims, i.e. Counts I, II and III.[2]  Dr. Lee opposes the motion.

### III.   Motion for Summary Judgment

#### A. Legal Standard

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991) (quoting Garside v. Osco Drug, Inc., 895 F.2d 46, 50 (1st Cir. 1990)).  The burden is on the moving party to show, through the pleadings, discovery and affidavits, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

A fact is material if it "might affect the outcome of the suit under the governing law . . . ." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A genuine issue of material fact exists where the evidence with respect to the material fact in dispute "is such that a reasonable jury could return a verdict for the nonmoving party." Id.

If the moving party satisfies its burden, the burden shifts to the nonmoving party to set forth specific facts showing that

---

[2] The complaint has been amended twice since the dismissal of the breach of contract claims but neither amendment substantively altered any of the claims.

there is a genuine, triable issue. Celotex Corp. v. Catrett, 477
U.S. 317, 324 (1986).  The Court must view the entire record in
the light most favorable to the non-moving party and make all
reasonable inferences in that party's favor. O'Connor v.
Steeves, 994 F.2d 905, 907 (1st Cir. 1993).  Summary judgment is
appropriate if, after viewing the record in the non-moving
party's favor, the Court determines that no genuine issue of
material fact exists and that the moving party is entitled to
judgment as a matter of law. Celotex Corp., 477 U.S. at 322-23.

### B. Application

#### i. Non-renewal claim (Count I)

Dr. Lee alleges that the Institute did not renew her for a
fourth term as an Investigator due to biases harbored by her
reviewers.  Specifically, she contends that the scores and
comments she received from the advisory panelists were not
substantively supported in light of her accomplishments and
submitted materials but, rather, were the result of their
"unexamined bias on the basis of gender and/or race/national
origin".  She argues that the ultimate non-renewal decision,
which relied heavily upon those scores, was, in turn, tainted by
the same discriminatory bias that infected the prior stage of

-11-

the review process and violates the non-discrimination
provisions of M.G.L. c. 151B.

Because Dr. Lee proffers no direct evidence of
discrimination (and, indeed, the parties agree that there is
none), the Court considers her claim under the familiar burden-
shifting framework set forth in McDonnell Douglas Corp. v.
Green, 411 U.S. 792 (1973).  The McDonnell Douglas analysis
proceeds in three steps. Forsythe v. Wayfair Inc., 27 F.4th 67,
76 (1st Cir. 2022).  First, Dr. Lee must adduce evidence
sufficient to make a prima facie case of discrimination.  Then,
the Institute must proffer a legitimate, non-discriminatory
reason for Dr. Lee's non-renewal.  Finally, Dr. Lee must show
that the Institute's stated reason, though facially legitimate,
was merely a pretext for unlawful discrimination.  Although the
burden of production shifts back and forth during the McDonnell
Douglas analysis, the ultimate burden of persuasion rests with
plaintiff throughout. Rodriguez-Cuervos v. Wal-Mart Stores,
Inc., 181 F.3d 15, 19 n.1 (1st Cir. 1999) (citing Texas Dep't of
Community Affairs v. Burdine, 450 U.S. 248, 253 (1981)).

### a. **Prima facie** showing

As a preliminary matter, there is some dispute as to the
standard to be applied at the first McDonnell Douglas step.
Typically, a plaintiff must show that:

> (1) she is a member of a protected class; (2) she was
> performing her job at a level that rules out the
> possibility that she was fired for inadequate job
> performance; (3) she suffered an adverse job action by her
> employer; and (4) her employer sought a replacement for her
> with roughly equivalent qualifications.

Smith v. Stratus Computer, 40 F.3d 11, 15 (1st Cir. 1994).

The First Circuit Court of Appeals ("the First Circuit")
has, however, endorsed an adapted version of the first McDonnell
Douglas step in denial-of-tenure cases. See Villanueva v.
Wellesley College, 930 F.2d 124, 128 (1st Cir. 1991) (citing
Banerjee v. Board of Trustees of Smith College, 648 F.2d 61 (1st
Cir. 1981)); Barry v. Trustees of Emmanuel College, No. 16-
12473-IT, 2019 U.S. Dist. LEXIS 20511 at *27 (D. Mass. Feb. 8,
2019) (applying Banerjee).  A plaintiff who has been denied
tenure must show

> (1) that [she] is a member of a protected group; (2) that
> [she] was a candidate for tenure and was qualified under
> the college or university's standards, practices or
> customs; (3) that despite these qualifications [she] was
> rejected and (4) that tenured positions in the relevant
> department remained open at the time [she] was denied
> tenure, in that others were granted tenure in the
> department during the same general time period.

Villanueva, 930 F.2d at 128.  Under both the usual standard and
its adaptation, the burden placed upon the plaintiff is
"relatively light" and, if met, the Court presumes that the
employer engaged in unlawful discrimination. Id. (citing
Burdine, 450 U.S. at 254).

Dr. Lee appears to urge the Court to consider her claim under the adapted standard, whereas the Institute avers that the denial-of-tenure cases are merely "instructive guidance specifically for the purposes of pretext [i.e. step three] analysis" and proffers Smith as the touchstone for its argument at step one.

Although the Institute, a non-profit biomedical research organization, is not a college or university, it nevertheless bears most of the relevant hallmarks of an academic institution and thus the adapted standard is appropriate.  Similar to many colleges and universities, the Institute expects high levels of research activity from its appointees and evaluates them in large part upon the fruits of their research program.  The differences between the Institute and traditional academic institutions, where they exist, are not dispositive.  For instance, although Institute Investigators for the most part lack the pedagogical responsibilities of college professors, that fact serves only to remove one factor from the "tenure" equation rather than change fundamentally the character of the Institute's review.  On the whole, the renewal process is substantially similar to a tenure decision, albeit one with a greater-than-usual focus on the candidate's research and, accordingly, the Court considers whether Dr. Lee has made a prima facie case under the denial-of-tenure standard.

-14-

The Institute does not dispute, for the purpose of summary judgment, that Dr. Lee is a member of a protected class or that she was rejected for renewal.  It is also apparent that "tenured positions . . . . remained open at the time" of Dr. Lee's nonrenewal, Villanueva, 930 F.2d at 128, because eight of the twelve Investigators in Dr. Lee's September, 2016, cohort were renewed, and the parties agree that the Institute does not limit the number of Investigators who may be renewed from any given cohort.  Thus, the only outstanding question at step one is whether Dr. Lee was "qualified under the [Institute's] standards, practices or customs".  Id.

Dr. Lee contends that she was qualified for renewal as an Investigator.  She notes that two of her four assigned reviewers, i.e. the people who likely would have conducted the most thorough examination of her materials, assigned her B or B+ final grades.  Those grades, although not at the top of the scale, would have supported renewal of Dr. Lee for a fourth term.  She also observes that her assigned reviewers and the Institute's scientific leadership "conceded her many achievements during her third term" and her continued leadership in her field.  Dr. Lee submits that, taken together, such evidence establishes that she fell within the group of qualified candidates for renewal as an Investigator.

The Institute disagrees and contends that Dr. Lee did not meet its legitimate performance expectations.[3]  It cites the low scores received by Dr. Lee and the significant criticism of her work levied by her reviewers and notes that none gave Dr. Lee an "A" score, meaning that not one of the 18 scientists who considered her materials and presentation concluded that she "very clearly fulfill[ed] most of the review criteria".  Rather, several reviewers expressed concern about "sloppy thinking" and adherence to weak, insufficiently tested models.

 While underwhelming, the evidence proffered by Dr. Lee is sufficient to make a prima facie case that she was qualified for renewal.  Several panelists, including two of those who had been assigned to review all her materials, concluded that she deserved a score in the "B" range, a score which the Institute considered adequate for renewal. Barry, 2019 U.S. Dist. LEXIS 20511 at *31 (requiring that a plaintiff denied tenure show that she was sufficiently qualified to be among those persons from whom a selection would be made) (citing Banerjee, 648 F.3d at 63)).

Dr. Lee's reviewers were uniform in their evaluation that she was not an exceptional candidate warranting an "A" score.

---

[3] While the Institute asserts under the usual, i.e. non-adapted, standard at the first McDonnell Douglas step, the substance of its argument on this point applies equally to a denial-of-tenure case.

If the standard were such, Dr. Lee would not meet it.  All that she must show at this step, however, is that she was at least in the middle range of candidates and her receipt of 11 "B" scores make an adequate case that she was. Villanueva, 930 F.2d at 128 (explaining that the plaintiff must show that her qualifications were at least comparable to those of a "middle group of tenure candidates" for which both a grant and a denial of tenure could be justified) (quoting Banerjee, 648 F.2d at 61).

### b. Non-discriminatory rationale

Having determined that Dr. Lee has made a prima facie case, the Court turns to the second McDonnell Douglas step, at which the Institute must produce a legitimate, non-discriminatory reason for the non-renewal decision. Che v. Mass. Bay Transp. Auth., 342 F.3d 31, 39 (1st Cir. 2003).  That intervening burden is "not onerous", and the Institute easily discharges it. Matthews v. Ocean Spray Cranberries, 686 N.E.2d 1303, 1309 (Mass. 1997).  The low scores assigned by the advisory panelists based upon their widespread, expressed concern with the quality of Dr. Lee's research, is a sufficient reason for the non-renewal decision. Santana-Vargas v. Banco Santander Puerto Rico, 948 F.3d 57, 60 (1st Cir. 2020).

### c. Pretext

At the third McDonnell Douglas step, plaintiff must present evidence from which a reasonable jury could infer that the

-17-

defendant's proffered reason for its decision was pretextual.
Bulwer v. Mount Auburn Hospital, 46 N.E.3d 24, 33 (Mass. 2016).
Evidence tending to show that a given rationale is pretextual
may include "weaknesses, implausibilities, inconsistencies,
incoherencies, or contradictions in the employer's proffer".
Harrington v. Aggregate Industries-Northeast Region, Inc., 668
F.3d 25, 33 (1st Cir. 2012).  Where the motive or intent of a
defendant employer is at issue, courts should be "particularly
cautious" in granting the employer's motion for summary
judgment. Kelley v. Corr. Med. Servs., 2013 U.S. App. LEXIS 2588
(1st Cir. Feb. 6, 2013).  Nevertheless, a plaintiff must offer
some "minimally sufficient" evidence of pretext to survive
summary judgment. Thiedon v. Harvard Univ., 948 F.3d 477, 497
(1st Cir. 2020); Medina-Munoz v. R.J. Reynolds Tobacco Co., 896
F.2d 5, 8 (1st Cir. 1990).

Some special considerations apply in a denial-of-tenure
case, to which the present action is akin. Villanueva, 930 F.2d
at 129.  It is no more the role of the Court to sit as a "super-
tenure" committee of one, id. (describing academic freedom as a
"special concern of the First Amendment"), than it is to second-
guess a company's business judgment, Velez v. Thermo King de
Puerto Rico, Inc., 585 F.3d 441, 450 (1st Cir. 2009).  On the
other hand, tenure decisions are not exempt from discrimination
law and the Court may not abdicate its duty of "eliminating

-18-

workplace discrimination" simply because the alleged
discrimination occurs in a research or academic setting.
Villanueva, 930 F.2d at 129; see Maw v. Bd. of Trs. of the Univ.
of the Dist. of Columbia, 926 F.3d 859, 864 (D.C. Cir. 2019)
(explaining that "[a]lthough the First Amendment grants a
university certain freedoms, the freedom to discriminate is not
among them").

In the interest of maintaining the "delicate equilibrium"
of academic freedom and non-discrimination, the First Circuit
has instructed that a plaintiff at the third McDonnell Douglas
step must show that reasons for denial of tenure or, in this
case, non-renewal were "obviously weak or implausible," or that
the prevailing tenure standards were "manifestly unequally
applied". Villanueva, 930 F.2d at 129 (citing Brown v. Trustees
of Boston University, 891 F.2d 337, 346 (1st Cir. 1989)); see
Barry, 2019 U.S. Dist. LEXIS 20511 at *33 (applying denial-of-
tenure standard at step three of McDonnell Douglas analysis).
In evaluating the plaintiff's argument, the Court may not
"simply substitute its own views" of her qualifications.
Villanueva, 930 F.2d at 129.  Rather,

> the evidence must be of such strength and quality as to
> permit a reasonable finding that the denial of tenure was
> "obviously" or "manifestly" unsupported.

Id.

-19-

Here, Dr. Lee contends that the Institute's non-renewal decision was both "obviously weak or implausible" and the product of standards which were "manifestly unequally applied". Villanueva, 930 F.2d at 129.  Both contentions essentially rest upon the same theory and are supported by the same evidence.  In brief, Dr. Lee argues that, throughout her review process, she was held to higher standards than male and non-Asian comparators.  That, according to Dr. Lee, evinces a manifestly unequal application of the renewal standards and consequently the Institute's proffered rationale, i.e. that her non-renewal was based upon its collective scientific judgment, is obviously weak and implausible.

In support of those two related theories, Dr. Lee avers that her reviewers 1) unfairly faulted her for disagreeing with a white male Investigator, 2) unconsciously punished her for acting against purported stereotypes of Asian women, 3) employed a highly subjective review process susceptible to bias and 4) departed from the standard process in her case, to her prejudice. Dr. Lee submits that those facts, taken together, create a "mosaic of circumstantial evidence" that would allow a jury to infer that she was discriminated against. Taite v. Bridgewater State University, Board of Trustees, 999 F.3d 86, 94 (1st Cir. 2021).

The Institute characterizes Dr. Lee's arguments as "strained and implausible" and contends that the negative evaluation and ultimate non-renewal decision were the product of the collective scientific judgment of the advisory panelists and the Institute.  It submits that because plaintiff has offered nothing more than "conclusory allegations, improbable inferences, and unsupported speculation" of discrimination, citing LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841-42 (1st Cir. 1993), summary judgment must enter in its favor.

Mindful that the evidence is to be considered as a whole, the Court, in the interest of orderly analysis, addresses Dr. Lee's contentions seriatim. Taite, 999 F.3d at 94.  Because the evidence, taken together, does not raise "the slightest inference that a discriminatory motive lurked beneath the surface" of the proffered reasons for non-renewal, the Institute's motion for summary judgment will be allowed. Villanueva, 930 F.2d at 131.

Dr. Lee first contends that the Institute applied a "double standard", subjecting her to greater scrutiny than white male Investigators.  She cites several examples of that purported double standard, mostly arising from what she contends to be disparate treatment of herself and another Investigator, Dr. Thomas Cech, simultaneously up for renewal.  Dr. Lee appears to fault one of her four assigned reviewers in particular for

-21-

promulgating such unfair comparisons, which she asserts arose
out of the reviewer's unconscious biases, but alleges that,
through a process of "group polarization", the biases of that
reviewer were adopted by the entire advisory panel.  That
adoption ultimately caused the President of the Institute not to
renew Dr. Lee for a fourth term.

None of the evidence proffered by Dr. Lee suggests that, in
her review, the Institute's renewal standards were "manifestly
unequally applied". Villanueva, 930 F.2d at 129.  Rather, the
advisory panelists and Institute leadership considered and
critiqued Dr. Lee's renewal application in the same manner, and
in accordance with the same standards, as other applications for
renewal of Investigators in her cohort.  Dr. Lee's contentions
are either conclusory or purport to require the Institute to
follow rules, such as a proscription on comparing one
Investigator to another and an accounting of "objective
accomplishments" (measured, in part, by the number of her
publications), to which it does not adhere.  Certainly the
criticism of Dr. Lee was harsher than that leveled at most of
the other Investigators in her cohort.  She fails, however, to
adduce evidence which would tend to show that the disparity was
due to the unequal application of Institute standards rather
than the collective scientific judgment of her reviewers.

Dr. Lee next contends that her reviewers' criticism of her research was a product of their unconscious bias.  It has been "long recognized" that unlawful discrimination can spring not only from conscious animus but also from stereotypes and unconscious bias. Thomas v. Eastman Kodak Co., 183 F.3d 38, 59 (1st Cir. 1999) (citing Hazen Paper Co. v. Biggins, 507 U.S. 604 (1993)); see Commonwealth v. McCowen, 939 N.E.2d 735, 767 (Mass. 2010) (noting that, since the 1990s, a number of studies have concluded that "implicit biases are real, pervasive, and difficult to change").  Discrimination is, moreover, no less unlawful because certain biases are unconscious, Douglas v. J.C. Penney Co., 474 F.3d 10, 14 (1st Cir. 2007), or difficult to apprehend, see, e.g., Christine Jolls & Cass Sunstein, The Law of Implicit Bias, 94 Cal. L. Rev. 969, 976 (2006).

Nevertheless, speculation about the influence of bias, unconscious or otherwise, is, without more, insufficient to survive summary judgment, and here, again, it is speculation, not evidence, that suggests the criticism of Dr. Lee was based on bias. Miceli v. JetBlue Airways, 914 F.3d 73, 80-81 (1st Cir. 2019); Brader v. Biogen, 983 F.3d 39, 53 (1st Cir. 2020).  Dr. Lee has proffered no evidence from which a jury reasonably could conclude that the defendant discriminated against her. Compare Lugo-Mariani v. Nicholson, No. 06-1473-ADC, 2009 WL 10719987 at *7 n.7 (D.P.R. Feb. 10, 2009) (entering summary judgment where

plaintiff "offer[ed] no evidence" that defendant harbored a bias against Puerto Ricans because, if the case went to trial, "the jury would be left to guess at the reasons behind the pretext") with Bulwer, 46 N.E.3d at 37 (holding that comments about plaintiff Belizean doctor of African descent, including that he was "not well suited for a career in internal medicine in this country" could, considered with other evidence of disparate treatment, indicate pretext). Rather, she adverts to a succession of actions, comments and criticisms which uniformly fail to evince bias.

Dr. Lee's remaining arguments are also underwhelming. She avers that the Institute departed from its normal procedures in her renewal review. While an employer's deviation from its regular procedures may allow an inference of discrimination, Dr. Lee fails to identify any such discrepancies here. See Taite, 999 F.3d at 96-97 (explaining that deviation from policy or procedure may allow inference of pretext); Bulwer, 46 N.E.3d 37-38 (same). Rather, she argues that Dr. Cech identified a "somewhat controversial" scientific disagreement between them when asked to disclose to the Institute any conflicts with the advisory panel. (Dr. Lee, an Investigator, was not a member of the advisory panel.)

Attempting to impute to the Institute whatever impropriety might attend to that apparently unusual disclosure, Dr. Lee

-24-

alleges that the Institute improperly scheduled her review for only a few hours after Dr. Cech's and failed to remind her reviewers to focus on her materials rather than her dispute with Dr. Cech "or other non-scientific issues".  As a result, plaintiff submits, "unconscious bias was permitted to taint [her] review".  That argument avails Dr. Lee little because her allegations of bias are conclusory and lack any connection to Dr. Cech's disclosure or the actions of the Institute.

Finally, Dr. Lee's criticism of the "almost completely unfettered subjectivity" of the renewal review criteria is misplaced.  Subjective criteria, far from prohibited, are often vital to the tenure or renewal decisions of an academic entity such as the Institute. See Sweeney v. Board of Trustees of Keene State College, 569 F.2d 169, 176 n.14 (1st Cir. 1978) (observing that "subjective evaluations are essential in certain positions" and that "[j]udicial tolerance of subjective criteria seems to increase with the complexity of the job involved"), rev'd on other grounds, 439 U.S. 24 (1978).  While that fact does not excuse the Institute from its legal obligation not to discriminate or excuse its decisions from judicial scrutiny, it also does not, without more, give rise to an inference of pretext sufficient to forestall summary judgment. Jackson v. Harvard University, 721 F. Supp. 1397, 1404 (D. Mass. 1989) (explaining that "the elasticity of promotion standards for

-25-

teachers in an academic setting does not constitute, in and of itself, evidence of discrimination"). For the reasons previously discussed, Dr. Lee fails to provide any evidence which would suggest that discriminatory animus entered into her renewal review under the auspices of "subjectivity".

### ii. Salary claims (Counts II and III)

Dr. Lee also alleges that, during her time as an Investigator, the Institute paid her less than it did male comparators at MGH for similar work. She claims that her purportedly substandard compensation constitutes salary discrimination in violation of M.G.L. c. 151B ("Chapter 151B") and M.G.L. c. 149, § 105A ("the Massachusetts Equal Pay Act" or "MEPA").

### a. Statute of limitations

As a preliminary matter, the parties dispute whether Dr. Lee's salary claims were timely filed. Chapter 151B requires that a plaintiff file her claim with the MCAD within 300 days of its accrual, M.G.L. c. 151B, § 5; see Verdrager v. Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., 50 N.E.3d 778, 799 (Mass. 2016), and bring suit, if at all, within three years. M.G.L. c. 151B, § 9 (requiring that any civil action under the chapter be brought "not later than three years after the alleged unlawful practice occurred").

For most of the period here at issue, MEPA imposed a shorter statute of limitations, requiring that a plaintiff commence an action within one year of the accrual of her claim, M.G.L. c. 149, § 105A (1996); Silvestris v. Tantasqua Reg'l Sc. Dist., 847 N.E.2d 328, 338-39 (Mass. 2006).  An amended version of the statute, extending the limitation period to three years, went into effect in July, 2018. M.G.L. c. 149, § 105A(b) (2018) (explaining that "[a]ny action based upon or arising under section[] 105A . . . . shall be instituted within 3 years after the date of the alleged violation").  Under Massachusetts law, an amended statute of limitations applies to a claim only if it is not already time-barred under the previously applicable statute of limitations. Commonwealth v. Rocheleau, 533 N.E.2d 1333, 1334 (Mass. 1989) (citing Commonwealth v. Bargeron, 524 N.E.2d 829 (Mass. 1988)).

Resolution of the timeliness question requires determination of the date on which Dr. Lee's claims accrued. Under Massachusetts law, a statute of limitations begins to run when a plaintiff knows, or should have known, that she has been harmed by the conduct giving rise to the claim. See Silvestris, 847 N.E.2d at 339.  If the plaintiff asserts that she did not know about the harm at the time it occurred, she bears the burden of demonstrating that lack of knowledge as well as her inability to discover the harm through the exercise of

reasonable diligence. <u>Geo. Knight & Co.</u> v. <u>Watson Wyatt & Co.</u>, 170 F.3d 210, 213 (1st Cir. 1999); <u>Riley</u> v. <u>Presnell</u>, 565 N.E.2d 780, 785 (Mass. 1991).

Further, while Massachusetts courts have concluded that some kinds of discrimination claims, such as those alleging a hostile work environment, concern a wrong of a unitary, continuing nature and thus are timely if any part of that wrong occurred within the limitations period, pay claims, which "give rise to a cause of action each time they occur and are easily identifiable", do not. <u>Silvestris</u>, 847 N.E.2d at 339; <u>Crocker v. Townsend Oil Co.</u>, 979 N.E.2d 1077, 1085 (Mass. 2012) (quoting <u>Silvestris</u>, 847 N.E.2d at 338).

### 1. Chapter 151B claim

The Institute contends that Dr. Lee knew or should have known about the alleged pay discrimination when she communicated concern about her compensation to with MGH officials in the early 2000s or, in any event, no later than August, 2016, when the Institute informed her that she would receive a salary increase due to an equity request from MGH.  Because Dr. Lee did not file her MCAD claim until July, 2017, the Institute submits that her Chapter 151B claim was untimely presented to the MCAD.

Dr. Lee rejoins that her Chapter 151B claim accrued in January, 2017, when MGH shared with her a redacted version of a letter from its Senior Vice President for Research concerning an

internal MGH salary equity study.  Although she admits that she was aware of the August, 2016 equity-based adjustment, she maintains that she was unaware of the "specific details of the decision that led to her underpayment from 2016 forward" until January, 2017.  Those "specific details" are the content of the study which purportedly show that Dr. Lee's salary was approximately $26,000 lower than it should have been.  She contends that the Institute's failure to adjust her salary to the MGH-recommended amount was a "distinct wrong" which, once discovered, she took action to remediate.

Dr. Lee's Chapter 151B claim is time-barred because she had sufficient notice of her injury at least as early as August, 2016. RTR Techs., Inc. v. Helming, 707 F.3d 84, 89 (1st Cir. 2013).  Her contention that she did not know the "specific details" of the alleged discrimination but only harbored a "general sense that she was underpaid" is immaterial.  The fact that a plaintiff does not know the extent of her injury does not arrest the statutory clock. Williams v. Ely, 668 N.E.2d 799, 804 (Mass. 1996); Silvestris, 847 N.E.2d at 336-37 (applying discovery rule to c. 149 claim).  Rather, all that is required is that the plaintiff has been put on notice that she has suffered appreciable harm from the conduct of the defendant. Id. Here, "warning signs abounded". RTR Techs., 707 F.3d at 90.  The August, 2016 email informing her that she would be receiving a

-29-

raise due to the review that MGH had conducted concerning pay as
it related to gender and seniority, was more than sufficient to
put her on notice.

In light of those facts, no reasonable jury could find that
Dr. Lee's Chapter 151B claim accrued after August, 2016, and,
accordingly, summary judgment will enter for the Institute.
Patsos v. First Albany Corp., 741 N.E.2d 841, 847 (Mass. 2001).

### 2. Massachusetts Equal Pay Act claim

Although Dr. Lee contends that she was unlawfully underpaid
throughout her time as an Investigator, she confines her MEPA
claim to the paychecks that she received after the amended
version of the statute went into effect, i.e. from July, 2018,
to the end of her phase-out period in September, 2018.  Because
she commenced the instant action within three years of July,
2018, she submits that her claim is timely, citing M.G.L. c.
149, § 105A(b).

The Institute asserts that, notwithstanding the 2018
amendment, the prior version of MEPA governs the plaintiff's
claim.  Because that version of the statute, unlike its
successor, imposes a one-year statute of limitations, the
Institute submits that Dr. Lee's MEPA claim is barred.

That argument is unavailing.  While Dr. Lee's claims
predating July, 2018, are governed (and barred) by the prior
version of MEPA, the Court perceives no bar to the post-July 1,

-30-

2018 claims. Rather, those claims are governed by the successor statute which provides that each unequal paycheck is a separate, actionable violation subject to a three-year statute of limitations. M.G.L. c. 149, § 105A.  Because the statute of limitations had not run when Dr. Lee brought her complaint, her MEPA claims are timely insofar as they pertain to her July, August and September, 2018 paychecks. M.G.L. c. 149, § 105A(b).

### b. Merits

The Massachusetts Equal Pay Act prohibits disparate compensation of individuals of different genders who perform comparable work. M.G.L. c. 149, § 105A(b) (providing that "[n]o employer shall discriminate in any way on the basis of gender in the payment of wages, or pay any person in its employ a salary or wage rate less than the rates paid to its employees of a different gender for comparable work"); see Gu v. Boston Police Dep't, 312 F.3d 6, 15 (1st Cir. 2002).  The statute allows, however, for variations in pay based upon, inter alia, seniority, merit, education, training and experience. M.G.L. c. 149, § 105A(b).

Whether work is "comparable" for the purpose of MEPA is determined through a two-step analysis. Gu, 312 F.3d at 15 (citing Jancey v. School Comm'n of Everett, 658 N.E.2d 162, 167 (Mass. 1995) ("Jancey I")).  At the first step, the Court inquires as to whether

the substantive content of the jobs is comparable, that is,
whether the duties of the jobs have important common
characteristics.

Jancey I, 658 N.E.2d at 167 (internal quotations omitted).  If

so, the Court then considers "whether the two positions entail

comparable skill, effort, responsibility, and working

conditions". Id.  Only if both questions are answered

affirmatively is the employer obligated to compensate the

employees equally.

That analysis requires a comparator employee, and the

parties dispute whether one exists here.  As a preliminary

matter, because Dr. Lee is an employee of the Institute, not

MGH, the only relevant comparators are other Investigators.[4]

M.G.L. c. 149, § 105A(b) (providing that no employer shall pay

different salaries to "its employees of a different gender").

During the relevant period, four other Investigators were based

at MGH.  All are male but three are plainly inapposite

comparators.[5]  The parties dispute whether the fourth, an

Investigator hereinafter referred to as "Investigator A", is

---

[4] The MGH study which precipitated Dr. Lee's August, 2016 salary
increase, and upon which Dr. Lee relies here, is of minimal
probative value because, with only a few exceptions, it compared
Dr. Lee to MGH employees rather than to Institute employees.

[5] Two Investigators had clinical (as opposed to exclusively
research) duties and the third was substantially senior to Dr.
Lee. M.G.L. c. 149, § 105A; see Jancey v. School Comm'n of
Everett, 695 N.E.2d 194, 196 (Mass. 1998) ("Jancey II")
(applying MEPA).

-32-

suitable.  The Institute argues that because Investigator A was paid approximately the same amount as Dr. Lee during the relevant period, he is not a proper comparator, citing <u>Petsch-Schmid</u> v. <u>Boston Edison Co.</u>, 914 F. Supp. 697 (D. Mass. 1996). Dr. Lee rejoins that Investigator A was significantly junior to her and, rather than foreclose her discrimination claim, their comparable pay supports it.

In any event, plaintiff has proffered scant evidence that the two jobs shared "common characteristics". <u>Jancey I</u>, 658 N.E.2d at 167.  In fact, there is very little evidence concerning Investigator A at all.  Even if the Court were to ignore the <u>de</u> <u>minimis</u> record and presume commonality at the first <u>Jancey</u> step due to the fact that both Investigator A and Dr. Lee were Institute Investigators (a presumption which § 105A cautions against) the dearth of information about the "skill, effort, responsibility, and working conditions" of Investigator A precludes a finding that at the second <u>Jancey</u> step that his job was comparable to Dr. Lee's. M.G.L. c. 149, § 105A(a) (providing that "a job title or job description alone shall not determine comparability"); <u>see</u> <u>Jancey II</u>, 695 N.E.2d at 196-97 (comparing, in detail, the "substantive job content of the cafeteria worker and custodian positions").  Accordingly, summary judgment will enter for the Institute on Dr. Lee's MEPA claim. <u>See</u> <u>Petusch-Schmid</u>, 914 F. Supp. at 706-07 (entering

summary judgment for defendant on MEPA claim where no evidence of comparators was presented).

### ORDER

For the foregoing reasons, the motion of defendant Howard Hughes Medical Institute for summary judgment (Docket No. 71) is **ALLOWED**.  The motions in limine (Docket Nos. 87 and 90) filed by the defendant are **DENIED as moot**.

**So ordered.**

                              /s/ Nathaniel M. Gorton
                              Nathaniel M. Gorton
                              United States District Judge

Dated June 9, 2022